**Judith A. HILL, Plaintiff,**

v.

**STEVEN MOTORS, INC., Defendant.**

**No. 00–1362–JTM.**

United States District Court,
D. Kansas.

Oct. 22, 2002.

Alan L. Rupe, Dwight David Fischer, Husch & Eppenberger, LLC, Wichita, KS, for Plaintiff.

Terry L. Mann, Deena Hyson Bailey, Martin, Pringle, Oliver, Wallace & Bauer, LLP, Wichita, KS, Mark G. Ayesh, Ayesh Law Offices, Wichita, KS, for Defendant.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

Plaintiff Judith A. Hill has instituted the present action against her former employer, Steven Motors. The defendant has moved for summary judgment. Upon reviewing all the pleadings and evidence submitted herein, the court finds that summary judgment is appropriate.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine

all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## Findings of Fact

Plaintiff Judith Hill is 57 years old. She was born March 3, 1945. She began working for Steven Motors on August 8, 1994.

Steven Motors is owned by Mike Steven, who owns several separate dealerships in the Wichita area. The CEO of Steven Motor Group is Harold Johnson.

In 1994, Hill was 49 years old, and worked for Conklin Cars. The General Manager at Steven Buick called to see if she would be interested in working for Steven Motors. Harold Johnson and Mike Steven were involved in the decision to hire Hill.

Hill wanted a written contract from Steven Motors. She has testified that Steven Motors had a reputation of going through employees and of changing pay plans. She was told that Steven Motors did not typically have written contracts, but she insisted, and was given a one-year written contract. The contract provided for renewal at the end of one year, if both parties were satisfied.

Hill's first position with Steven Motors was that of Finance and Insurance Manager. F & I Managers are responsible for arranging vehicle financing, credit life insurance, extended warranties, and other similar products. They are typically paid by commission.

When she began work, Hill was paid 3% of combined new and used vehicle gross profit. In addition, she had a guaranteed minimum salary of $4300 per month. Employees of Steven Motors do not typically have long-term salary guarantees. Most F & I Managers have a guarantee for an introductory period of around 90 days, during which they get their income stream started.

During her first year, Hill had commission earnings in excess of her $4300 guarantee in one month only, August of 1994.

During her first year, Hill earned only $32,253 in commissions. Her minimum salary guarantee during this period was $51,600. In 1995, Hill's written employment contract was not renewed, and she became an employee at will.

On August 8, 1995, Hill was reclassified as a Fleet and Leasing Manager. She was thus responsible for making sales contacts with companies and credit unions. Her pay plan was for 20% of vehicle gross, or a $3500 guarantee. She held this position until August of 1996. During that period, her commissions never exceeded her guarantee. She earned commissions of only $23,588. Hill's minimum salary guarantee during this period was $45,500.

It is uncontroverted that the defendant was not satisfied with Hill's performance. Mike Steven testified that his practice has been to try unsuccessful employees in other positions, moving them around the various dealerships in an effort to find a good fit.

Hill is married to Mike Hill, who was Sedgwick County Sheriff during this time. Mike Steven served with Sheriff Hill on the executive committee of the Wichita Crime Commission, and wanted to maintain a good relationship with him. As a result, Steven testified, he did not terminate Hill even though her performance remained unsatisfactory.

In 1996, Steven Motors had the opportunity to buy a lawn tractor facility in west Wichita. Since it was unsure an automobile dealer franchise would be available, it entered into a three-year lease with an option to buy the property at 11028 W. Kellogg Avenue. For a short period of time, Don McMahon, who was then the General Manager of Steven Buick, oversaw the west Wichita location. McMahon was responsible for advertising and inventory control.

Hill was promoted to General Manager of the west Wichita location on September 2, 1996. At the time, she was 51 years old. She was paid 6% of the combined sales and F & I gross profit, with a $4000 minimum guarantee.

Hill had never before been a General Manager of one of the Steven dealerships. She was paid differently from other General Managers—who are typically paid a percentage of net profit, with no guarantee—both because the west Wichita facility was new and would thus not have a profit right away, and because the facility did not have a Parts and Service Department. Hill was paid more like a Sales Manager, based upon gross profit from sales and F & I.

During 1997, the west location had a profit of $91, 201, which was not large relative to other Steven dealerships.

During Hill's early tenure as General Manager of the west location, Jeff Horning was Sales Manager at the location. Hill reprimanded Horning for following company sales procedures, and told him that Sales Managers were "a dime a dozen." (Johnson dep. at 183). Horning left the west Wichita location in February of 1998 because of Hill's attitude toward him. He is currently Sales Manager at Steven Import Store, and is performing those duties very successfully.

After Horning left, the profits at the west Wichita location declined. In 1998, the west facility lost $127,857.

As a General Manager, Hill was expected to attend the mandatory General Manager meetings with Mike Steven held each Monday, Tuesday, Thursday, and Friday. Mike Steven felt that Hill failed to attend these meetings adequately. Although Hill contends that other General Managers were often absent from the meetings, the allegation is unsupported in the record, which merely indicates that other managers were sometimes absent. According to Steven, Hill "hardly ever" attended the meetings. (Steven dep. at 166). Accord-

ing to Hill, she attended all of the meetings "with the exception of a couple of times." (Hill dep. at 99).

The defendant stresses that Steven Motors' policy prohibits alcohol on company premises. However, Hill kept liquor in her desk, and sometimes drank it at the dealership with her subordinates. There is evidence, however, that while the official policy may prohibit alcohol on company premises, its presence is nonetheless tolerated.

It is uncontroverted that the defendant believed Hill had difficulty following company procedures. Harold Johnson has testified that Hill told him things "are different on the west side" and that she did not want to "do the procedures that Mike Steven wants me to." (Johnson dep. at 181). The response to the motion for summary judgment cites Hill's affidavit statement that she did ultimately adhere to company procedures, but there is nothing to controvert the statements Johnson attributes to her.

The defendant also cites problems with Hill's use of "pink sheets," documents appraising trade-in automobiles. Johnson has testified that Hill told him she could value trade-ins without using the pink sheets, that pink sheets were not a good way to do it. Johnson felt that Hill was overvaluing trade-ins. Again, the response cites Hill's affidavit statement that she, in fact, did use pink sheets on her

deals. However, the fact that Hill made statements to Johnson which he understood as indicating she opposed company policy, and his belief that she was overestimating trade-in values, are uncontroverted.

Johnson also testified that Hill refused to properly complete paperwork, including lease forms and lease return forms, which forced other employees to complete the work. Sometimes, according to Johnson, the company was charged back for damage to cars which had not been properly noted on Hill's incomplete documentation. Hill admits that, as to the leases, she sometimes made mistakes on the "countless forms" of the various dealerships, but that she corrected her mistakes and that no one ever complained to her about making mistakes on these forms. (Hill aff. at ¶ 18).

While Hill was General Manager at the west Wichita facility, Steven Motors had Saab and Subaru franchises there. It is uncontroverted that, on several occasions, factory representatives of these manufacturers told Johnson and Mike Steven they were not happy with the performance of the dealership, and they did not think Hill had hired suitable Service Managers and Parts Managers.

The west Wichita location was so unprofitable that Harold Johnson wanted to close it and lay off all its employees in mid–1999. In 1999, the location lost $501,351.[1]

---

1. The plaintiff's response frequently cites certain Sales Variable Profit reports generated by the defendant, in an attempt to assert that the west Wichita dealership was not unprofitable. However, the evidence fails to establish that these reports have any value in assessing actual profitability of the various dealerships, or that they were regarded as such by the defendant. To the contrary, Mike Steven testified that they were not profit and loss statements, but only tracked some important expenses and gross figures. The evidence is that they were understood at Steven Motors to *not* adequately assess profitability across

dealerships. Plaintiff's citations that they have such value is unfounded. Specifically, plaintiff relies on the answer to a hypothetical question put to Mike Steven: whether, if he had to assess profitability based on *either* the SVP reports *or* on projections of profits, which he would use. Steven testified that, under those conditions, he would choose the actual SVP reports. This of course does nothing to transform the SVP reports into something they are not—fair measures of profitability. There remains no evidence to controvert the defendant's consistent evi-

A number of General Managers have been terminated for unsatisfactory financial performance. The first General Manager Hill had reported to at Steven Buick was terminated. Ralph Williams, a General Manger at Steven Ford–Mercury was terminated. Similarly, Pam Sommerville, the General Manager of Steven Chevrolet in Arkansas City, was removed from this position after consistently losing money.

No one ever told Hill that she should not have the General Manager position because of her gender. No one ever told her she could not do the job because she was female. No one ever said anything derogatory to her because of her age.

Steven Motors has had two other female General Managers, Christine Enquist and Pam Sommerville. Christine Enquist is the General Manager at Steven Mitsubishi and Steven Buick. Sommerville was General Manager at Steven Chevrolet in Arkansas City from September, 1998 to June, 2000. In addition, Steven Motors has had a number of other female employees in management positions.

In late 1998 or early 1999, Johnson and Steven began negotiations with Pam Bjork, the daughter of the late Don Schmid, founder of Don Schmid Dodge located on South Broadway in Wichita to take over management of that dealership and move it to the west Wichita location. Hill knew of these negotiations.

Pam Bjork wanted Elden Hull, General Manager of Don Schmid Dodge, to have the same position when the dealership moved. Steven agreed.

On July 11, 1999, Hill suffered a stroke while at home. She was first treated at Via Christi Medical Center, admitted to the Stroke Unit, given pain medication, and monitored for four days. She was released from the hospital on July 15, 1999.

She was then treated for twelve days on an in-patient basis at Our Lady of Lourdes Rehabilitation Center until July 27, 1999. She continued out-patient treatment through September.

During her hospitalization, Hill was unable to perform any of her job duties. She was off work for 22 weeks, from July 12 until December 12, 1999.

Hill has no paid sick leave plan. Nevertheless, Steven Motors continued to pay her for several weeks, issuing pay checks on July 15, July 30, and August 16 of 1999. Hill does not know of any other General Manager who was paid when he or she was not working.

During her absence, Sales Manager Dennis Pugh acted as General Manager.

The relocation of the Dodge dealership was finalized during Hill's absence. Mike Steven and Harold Johnson created the Steven–Johnson Management Group, L.L.C., which entered into a management agreement with Don Schmid Motor, Inc., on August 30, 1999. Under the agreement, Steven–Johnson Management was to use its best efforts to maximize sales of the dealership business. Don Schmid was given power to terminate the agreement on 60–days' notice.

Elden Hull became General Manager at the west Wichita location. The agreement was approved by the manufacturer representative.

During September, 1999, Hill suffered an acute gallbladder attack, and had her gallbladder surgically removed on September 10, 1999.

---

dence that the SVP reports do not reflect all of Steven Motors' expenses (they exclude, for example, all information reflecting a dealership's rent and utility expenses, as well as the respective expenses for the service, parts, and F & I departments) and thus are not a fair reflection of the actual profitability of the various dealerships.

On September 13, 1999, Harold Johnson told Hill that she would not be the General Manager at the west Wichita location when she returned to work. Three days later, Hill wrote to Johnson that she believed she would have her job back if she was younger or male.

Johnson wrote to Hill on September 27, 1999 that her age and gender had nothing to do with the decision not to retain her as General Manager. He also outlined the history of financial difficulties at the location, and the negotiations with Don Schmid Dodge.

Hill testified that, following the stroke, she had trouble using stairs for a while. Also, for a while her right arm sometimes did not function properly. She continues to have some difficulty with her balance while moving. She has to watch her step on flights of stairs of more than three or four steps. She has testified that she doubts she can water-ski, as she used to do. She also cannot garden as much as she did before, because of her balance problem. However, after December of 1999, the stroke has not affected her ability to see, hear, breathe, learn, speak, perform manual tasks, care for herself, or, with effort, her work. She has "ever so brief" instances of difficulty in doing math or reasoning, but, again, these do not stop her from doing any sort of work. (Hill dep at 360). After her rehabilitation program, her only ongoing treatment has been an annual checkup, including an MRI. When she visited her neurosurgeon in August of 2000, he found she had "no trouble with balancing or walking" and that her strength had returned to normal. (Def.Exh. 27). Her doctor released her with no restrictions on April 7, 2000. She has described her recovery as miraculous.

In her response, plaintiff stresses comments made by Johnson that she had "worked the old body pretty hard, and maybe you should do something less stressful." (Hill dep. at 114).[2] However, it is uncontroverted that this comment occurred while she was still undergoing rehabilitation, was unable to move her right arm or her hands, and had problems with addition and subtraction.

Steven and Johnson were not satisfied with Elden Hull's performance, and he was terminated on December 27, 1999. Hull is male, younger than Hill, and had not requested any FMLA leave. After Hull's termination, Pugh became General Manager. Pugh was terminated from this position a short time later, when the dealership's performance did not improve. Ron Anderson was then promoted from Steven Chrysler to General Manager at Don Schmid Dodge. He failed to improve the dealership, and was terminated in turn. Like Hull, Pugh and Anderson are both male, younger than Hill, not disabled, and had not requested any FMLA leave.

On November 21, 2000, Gary Shaffer replaced Anderson as General Manager at Don Schmid Dodge. The dealership has become more profitable, and Shaffer has remained in that position to the present.

On October 22, 1999, while she was still off work, Hill's attorney wrote to Steven Motor's in-house counsel, requesting that she return to her position as General Manager. He stated that Hill intended to file an age and gender discrimination charge against Steven Motors, and was finalizing her charge at that time.

On November 24, 1999, Dr. Stephen A. Fields prepared a note stating "Judy has been under my care and restricted from working since July 10, 1999. She may

---

**2.** Johnson avers that he might have suggested Hill consider less stressful work, but denies making any of the rest of the comment Hill alleges he made. (Johnson aff. at ¶ 6).

return to work December 6, 1999. She is limited to 40hrs/wk and 8 hrs per day." (Def.Exh. 34).

Steven Motors concluded that a Fleet and Leasing Manager position would be appropriate in light of Dr. Fields' restrictions, and created such a position for her. Hill has testified that as General Manager at the west Wichita location, she routinely had worked up to 70 hours per week. General Managers at Steven Motors typically work six days a week, and regularly work 50 to 60 hours per week, and frequently work longer hours than that.

On November 30, 1999, Hill filed a complaint with the Kansas Human Rights Commission, alleging sex and age discrimination.

Hill worked as a Fleet and Leasing Manager from December of 1999 to January of 2001. During this time, her pay was 25% of gross profit, with a $3000 guarantee. Her commissions (totaling $15,839) never exceeded the guaranteed minimum (totaling $39,000) during this period. Hill sold no cars at all during November and December of 2000.

Unlike other salespersons at Steven Motors, as Fleet and Leasing Manager, Hill was not restricted in the brand of cars she could market. She did not have to be in any one location. She was given a cellular telephone, a pager, and business cards listing her numbers.

Hill has stated that she was not successful in the Fleet and Leasing Manager position because receptionists at Steven Buick did not pass messages on to her. When she complained to Johnson about this, Johnson immediately telephoned the receptionists, telling them to be sure Hill got all telephone messages. The receptionists began a log of calls for Hill; the log shows Hill rarely received calls at Steven Buick. When she did, the receptionists noted that they paged Hill, sometimes repeatedly. Hill did not make any further complaint to

Johnson about the issue. Hill did not give potential customers her cell phone and pager numbers, but she did not do so because customers did not like to call a pager. Hill has not identified any evidence based on first-hand knowledge that the Buick receptionists failed to pass on her calls.

Hill alleges that she was retaliated against because she was told she could not take over Mike Steven's office at the Steven Buick dealership. Hill and Sally Volbrecht were allowed to share one of Steven's offices at the dealership. There is no indication any other employee was permitted to use Steven's office.

Hill alleges that Christine Enquist, General Manager of Steven Buick, sabotaged her sales efforts when she learned of her pending lawsuit. However, the only instance of such sabotage identified by Hill in the context of the present motion arose when Walt Lesline allegedly told her that Enquist had lowered the bid on a used Cadillac from $10,000 to $8,000, causing the sale not to go through. Lesline has testified that Enquist told him she wanted to see the bids on everyone's cars, including Hill's, but that no one told him how to bid cars. He testified he could not recall Enquist ever changing any bid calculated by Hill.

Mike Steven hired Walt Lesline when Lesline was 65 years old. He also has heart arrhythmia. He believes he has been treated fairly by Steven Motors.

On March 10, 2000, Hill filed an amended administrative complaint, adding claims of disability discrimination and unlawful retaliation.

On several occasions, Harold Johnson referred customers to Hill. Johnson could have referred them to a particular dealership, but he referred them specifically to Hill. Johnson wanted Hill to have credit

for the sale, and wanted her to be successful as Fleet and Leasing Manager.

In January of 2001, Hill was transferred from Fleet and Leasing Manager to F & I Manager at Don Schmid Dodge. Mike Steven suggested to Gary Shaffer that he try Hill in this position. Her pay in this position was $4000 guaranteed for six months, followed by the standard F & I pay plan. Her guarantee during the previous year in the Fleet and Leasing position was $3000 per month.

Hill was one of two F & I Managers at the dealership; the other was Dean Harris. Harris is male, not disabled, and sixteen years younger than Hill. He was paid strictly on the basis of commission, with no guaranteed salary.

From January to July of 2001, Hill had earned commissions of $14,955. Her guaranteed salary was $24,000. Gary Shaffer testified that he was dissatisfied with the level of cooperation between Hill and Harris. Harris told him that he had to do a disproportionate amount of work with cash customers, that Hill would be intentionally unavailable to meet with customers if she thought they were going to pay cash.

Shaffer talked to Harold Johnson and Mike Stevens about the F & I department. They gave Shaffer permission to do whatever he needed to do to effectively manage the dealership.

In June of 2001, Steven Motors ended Hill's guaranteed salary effective July 1, 2001. F & I Managers typically do not have a long-term salary guarantee. At this time, other F & I Managers, including younger persons and males, had no long-term salary guarantee at all.

On July 20, 2001, Hill wrote to Shaffer, alleging that she was being retaliated against because of her lawsuit. In support, she noted that the guarantee was being discontinued, that Shaffer had complained to her about her three weeks of absences since starting at the dealership, that Dean Harris received two bonuses while she had received none, and that Shaffer had suggested a schedule under which the F & I Managers would have only a half day off.

Shaffer met with Hill shortly thereafter. Hill produced a schedule she had created for herself. When she asked about the bonus paid to Harris, Shaffer said that he had set a goal for the finance department, which he divided in half. He awarded the bonus to Harris because he had exceeded his half of the objective. Hill had never met her half of the goal. He told her that the F & I Managers would work a split shift, and that she would be treated just like Dean Harris in scheduling.

During the same month, Shaffer heard rumors that Harris was going to resign. Harris, meanwhile, had been hearing rumors he was going to be fired. Shaffer has testified this rumor was not true. He checked into the rumors, and found that Hill was the source of both. Although Hill denies telling Harris he was going to be fired, the fact remains that the dealership management was presented with a variety of evidence from which it could and did conclude in good faith, that Hill was involved in spreading these rumors. For example, it is uncontroverted that Harris told Johnson that Hill had told him he was going to be fired.

On July 23, 2001, Hill was terminated. Dean Harris left at approximately the same time, by mutual agreement. Hill and Harris were replaced by Ryan Hurd and Joe Gastineau, both under the age of 40 years. Neither performed satisfactorily, and both were terminated within six months. Hill's termination occurred nineteen months after her first KHRC complaint.

Hill complains that she was paid less than men doing the same job. She identi-

fies two men in this respect, Ralph Williams, the General Manager of Steven Ford–Mercury in September of 1996, and Craig Ruiz, General Manager of Steven Subaru. Ruiz was promoted to General Manager of the Subaru dealership on December 9, 1996. Like Hill, he had a $4000 guarantee. However, he was paid 10% of the *net* dealership profit; Hill was receiving 6% of the *gross*. In 1997, Ruiz received a total of $54,180; Hill received a total of $65,230. Ruiz was transferred to a Sales Manager position at Eddy's Toyota in August of 1997 when the Subaru dealership failed to operate profitably.

Prior to September 16, 1999, Hill spoke with Greg Anderson, Steven Motors corporate counsel by telephone, regarding her FMLA request. Anderson told Hill that he did not know where the FMLA forms were, that he did not think she was entitled to FMLA leave, and that they would check into it. Hill later called a secretary in Steven Motors corporate offices, and asked for an FMLA form to be faxed to her. She then had her doctor fill out the FMLA paperwork, which she returned to Steven Motors. She never received a response other than Anderson's initial comment that he did not believe Hill was qualified for FMLA leave.

It is controverted whether Anderson told Hill she was a "key" employee under FMLA. Anderson did not tell her of her rights as a key employee. He did not tell her that the leave would be counted against her FMLA entitlement, that a medical certification of a serious medical condition would be required, or advise her of substitute leave or her restoration rights. However, Hill already knew of the certification requirement, and submitted the Certification of Health Care Provider Form.

### Conclusions of Law

■ The court grants summary judgment as to Hill's age and gender discrimi-nation claims for multiple reasons. First, the court finds that Hill has failed to demonstrate the existence of a prima facie case with respect to either claim. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). With respect to the failure to make Hill the General Manager of the new Don Schmid Dodge dealership, there is no evidence that the position remained available to Hill, or that she was qualified for the position. With respect to the contention that Hill should have been made a Sales Manager after her return to work in 1999, there is again no proof she was qualified for the position. Finally, with respect to her termination when she was F & I Manager, there is no proof that males or younger employees were treated more leniently than Hill.

To the contrary, the evidence demonstrates that younger, male F & I Managers were also terminated when they failed to generate satisfactory results. The evidence equally demonstrates that the General Manager position was not available, since the old west Wichita dealership was essentially eliminated, and the General Manager position at the new Don Schmid Dodge had been assigned during the negotiations with that company to its existing manager, Elden Hull. Finally, the evidence is uncontroverted that Hill had a history of performing at an unsatisfactory level.

■ Even if Hill were deemed to have made out a prima facie case, summary judgment is appropriate because Steven Motors has advanced legitimate reasons for its actions, none of which has been shown by Hill to be a pretext for age or gender discrimination. With respect to Hill's loss of her General Manager status, the evidence establishes that this was the result of business negotiations which allowed Steven Motors to expand its west side presence by partnering with another

established Wichita dealership. One of the conditions imposed by its new partner was that its existing manager assume the role of General Manager at the combined facility. Further, the evidence establishes that Hill was not physically able to return to the General Manager position, even if it were available. The uncontroverted evidence is that General Manager positions typically require 50 and sometimes as many as 70 hours per week. Hill herself was frequently required to work 70 hours a week when she held that position. However, when she returned to work in late 1999, Hill's doctor prohibited her from working more than 40 hours per week.

Further, the evidence is uncontroverted that the defendant was dissatisfied with Hill's performance history. The defendant had an honest belief that its actions were justified to advance its business interests. *Bullington v. United Air Lines*, 186 F.3d 1301 (10th Cir.1999). The evidence is uncontroverted that the management at Steven Motors was presented with information that Hill was spreading unfounded and demoralizing rumors at the company shortly before her termination. And Shaffer was unhappy with Hill's job performance. He believed, for example, that Hill was improperly avoiding her share of cash customers. In the light of the uncontroverted evidence set forth above, the court finds that legitimate business reasons supported the job actions relating to the plaintiff.[3] Plaintiff's age and gender

discrimination claims are not supported in the evidence.

■ The court also grants summary judgment as to Hill's claim of disability discrimination. First, the evidence establishes that Hill is not "disabled" within the meaning of the Americans with Disabilities Act (ADA). *See Bolton v. Scrivner, Inc.*, 36 F.3d 939 (10th Cir.1994). Hill claims that she is impaired in the major life activities of remembering, thinking or learning, and moving. The evidence does not support these claims. Assuming that "remembering" is a major life activity, there is no evidence that Hill's impairment is substantial. Her own testimony is that on "occasions" she has difficulty remembering. Plaintiff has provided no evidence differentiating her inability to remember certain events from that experienced by the general population. There is no evidence that Hill's memory loss is "considerable" or exists "to a large degree." *See Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

Similarly, while Hill stresses that she was forced to undergo a "relearning process" following her stroke, this is not controlling. The evidence establishes that that process has been completed; it is not ongoing. At most, Hill states she has occasional "glitches" in her thinking. As with her memory, there is no attempt to demonstrate that this represents a significant impairment. Indeed, Hill herself stress

---

**3.** Equally without merit is Hill's contention, advanced for the first time in the Response to the Motion for Summary Judgment, that she was discriminated against when Steven Motors failed to adequately support the west Wichita facility with financial resources. Hill has failed to provide any support for this claim other than generalized speculation. While Steven Motors may have given more resources to some of its dealerships, it is uncontroverted that the various dealerships

are not all the same size. The west Wichita facility offered relatively smaller product lines (Saab and Subaru). The evidence establishes that Steven Motors invested well over a half million dollars in supporting the west Wichita dealership while Hill was General Manager. The evidence does not support any inference that the defendant secretly plotted to destroy this investment, starving it of resources, simply so it could discriminate against the plaintiff.

that, with effort, she "overcomes [her problem] on a daily basis."

Finally, Hill also has failed to demonstrate a significant impairment in the major life activity of moving. There is no evidence that Hill's impairment prevents or severely restricts her from moving. The evidence establishes that Hill "occasionally" loses her balance, and sometimes stubs her toe. Again, there is no evidence that Hill's impairment is substantially greater than that experienced by the general population, and no evidence that the alleged impairment severely restricts her movement. Hill's physician reports that she has "[n]o trouble with balance or walking." (Def.Exh. 27).

■ The plaintiff not only failed to demonstrate that she was actually disabled, the evidence fails to support any inference that the defendant "regarded her" as disabled. Plaintiff's only evidence on this point centers on comments allegedly made by Harold Johnson suggesting concern for her health. However, it is uncontroverted that these comments were made while Hill was still recovering from her stroke, at a time when plaintiff's own evidence establishes that she was unable to return to work. Plaintiff has not identified any evidence demonstrating or suggesting that the defendant regarded her as disabled once she was released to return to work. Similarly, there is no evidence that Hill had a record of disability within the meaning of 42 U.S.C. § 12102(2)(B). Accordingly, the court grants summary judgment as to plaintiff's ADA claim.

■ Hill also advances a claim under the Family Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601 et seq. She alleges that the defendant misinformed her of her FMLA rights This claim must be dismissed pursuant to *Ragsdale v. Wolverine World Wide, Inc.* 535 U.S. 81, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002), since Hill cannot establish that any of her rights under the FMLA were impaired. Hill was on leave for 22 weeks. The FMLA provides only 12 weeks of unpaid leave. Her rights under the FMLA expired October 4, 1999 (12 weeks after she began her leave on July 12). Although Hill now claims that she would have tried to return to work earlier, the uncontroverted medical evidence (from Hill's own doctor) is that she was physically restricted and unable to return to work prior to December 6, 1999. Plaintiff has not demonstrated any act by the defendant which resulted in an actual impairment of her rights under the FMLA.

■ Finally, the plaintiff has advanced claims that she was subjected to various acts of retaliation. Summary judgment is appropriate for these claims as well.[4] Hill contends that she was retaliated against when Steven Motors removed her from the position of General Manager, and instead gave her the Fleet and Leasing Manager position. However, the uncontroverted evidence establishes that the defendant decided on this course of action prior to any protected activity by Hill.

■ Hill also cites the removal of her salary guarantee as F & I Manager as of July 2001 as evidence of retaliation. However, the evidence in the case fails to create any inference that this was the product of retaliation. The salary guarantee was removed six months after it began, consistent with the terms of the original job offer. Further, the salary guarantee was

---

4. In addition to the major instances of supposed retaliation cited above, Hill has also cited a variety of other events as supposedly evidencing retaliation by the defendant. The court finds that these events fail to constitute a significant change in her employment status, are based on inadmissible evidence, or both.

removed over a year and a half after Hill instituted her charge of discrimination.

■ Finally, Hill cites her termination. She attempts to connect this with her deposition in the present action, which Mike Steven attended and who has stated he was "hurt" by some of her testimony. However, the uncontroverted testimony establishes that the decision to terminate Hill was independently reached by Shaffer, and simply confirmed by Steven. Shaffer's decision was the result of his perception of Hill's performance over the preceding months. The uncontroverted evidence establishes that, immediately prior to her termination, Shaffer discovered information which led him to believe Hill was spreading false rumors at the dealership. There is no evidence Shaffer was aware of any matter addressed in Hill's deposition, or was motivated in any way by statements made in the deposition. And, as noted above, these events occurred long after Hill's initial charges of discrimination.

The plaintiff does not respond to defendant's arguments against her claims relating to the Equal Pay Act. Summary judgment on these claims will also be granted.

IT IS ACCORDINGLY ORDERED this _____ day of October, 2002 that the defendant's Motion for Summary Judgment (Dkt. No. 117) is hereby granted.